Accommodated by Mr. Neffer. Nair. Oh, she did well. She did wonderfully, and I already told her I would answer to anything that she asked for.       I just got a little confused. I'm sorry. I'm sorry. I'm sorry. I don't know if the clerk explained to you that Justice Litton is unable to be here today, but he will be listening to the recording of oral arguments. And certainly we'll all be conferencing in a case before the session starts. If you were wondering. Did they explain it to you? No, no, so I do appreciate the clarification. Well, may it please the Court, counsel. My name is Johnike Nair. I am here representing Mossville Land Investments, the plaintiff appellant in this case. The issue before the Court today is whether the County Board's denial of Mossville Land Investments special use petitions was rationally related to a legitimate government purpose and not arbitrary or unreasonable. As the Court is aware, this case has been extensively briefed. This is actually, I believe, the third time we've been before the Court for oral argument. Two cases before, one of which was remanded for de novo review as a legislative decision by the trial court. That has been done, and that is what we are here reviewing today. So I will not spend too long going into the facts and so on. We'll just do an overview, and I'd like to respond to any questions that the Court has. The County has characterized the question in this case as whether there is room for a legitimate difference of opinion and whether Mossville Land Investment or MLI's right to special uses is fairly debatable. And we would answer both questions in the negative. The vast weight of the evidence in this case supports the issuance of the special use permits that were sought. But yet you didn't summarize that vast evidence in your brief for us. Yes, Your Honor. We're aware that it's somewhat diffused throughout the brief, and the reason for that was simply space more than anything else. It was also fully briefed in front of the trial court. If I could briefly review some of that evidence. I don't want to divert you. I just make that observation. I understand, Your Honor, and I will be coming to that in a moment. You provided us with a lengthy appendix, but when you don't do a statement of facts, then that requires us to sit through the appendix itself. I understand, Your Honor. Please proceed. Really, the question that is posed from our perspective, and I think we made it clear in the reply brief where we had an issue, is whether there is truly a meaningful review of a denial of a special use petition by a county board at this point under the case law. For example, is a neighbor being concerned about a project enough to create a rational basis in the absence of any other negative evidence? How much evidence in support of a special use petition is required to support that and to negate the rational basis for denial? And these are the questions that we've struggled with. I think the trial court struggled with them as well. So I will review the facts just briefly, Your Honor, not as to each of the elements, of course, at this point. The property at issue consists of two parcels. When you talk about the elements, are you talking about the elements for special use in the county ordinance or the LaSalle? Yes, Your Honor. In fact, both of them sink. So we treated them together for many purposes. I would agree that the LaSalle factors seem to be the primary guide to the court for de novo review of a decision. What decision are we reviewing de novo? I'm sorry, the de novo legislative review before the trial court of the county board's denials. Our review is not. Well, we have advanced an argument that de novo review could be appropriate under these circumstances. I would agree that typically the clearly erroneous standard does govern this court's review of a zoning decision, for example. Again, we do not believe that this is a zoning decision. And I will divert myself a little bit, if I may, Your Honor. The law changed during the pendency of the original appeal to provide for de novo review of the zoning of the special use denials legislative decision. And there is a conflict in the law as it stands today because the law provides, and this is section 12012.1 in the county's code, that a decision by the county board on an application for a special use shall be subject to de novo judicial review as a legislative decision, regardless of whether the process in relation thereto is considered administrative for other purposes. So what we have is something of a mixed bag. The legislature is saying, oh, it's still administrative. We just want you to treat it like it's legislative on appeal. And that has left us in sort of a quandary on some of these elements. For example. I'm not sure I agree with you. I think the statute says that the trial court looks at it, de novo. That's true. But when you look at the trial court's decision, I don't think that we apply a de novo standard of review. But I know your opponent will be speaking. No, Your Honor. I would agree that if this is treated like a normal zoning, loosely a zoning appeal, this court's review would be on the clearly erroneous standard. And the statute seems to ask you to do that, to review this as though it were a normal zoning appeal from a trial court decision that conducted a de novo review. However, because of this inconsistency in the law where the decision is still an administrative decision, that we think throws a wrench in the works. And also, further supporting our request that the court consider this case de novo is the fact that no live evidence was taken by the trial court. This court has clearly an equal opportunity to review the record which was stipulated by the parties. And that's an additional basis that we believe this court could review de novo. Now, again, Your Honor, I want to reiterate that we believe that regardless of the standard of review being clearly erroneous, we still have a clear error on the part of the trial court. So if I could turn to the evidence brief. With respect to the LaSalle factors? The LaSalle factors and to the extent they're still relevant, the Peoria County zoning or Peoria County ordinance factors, which from the case law side, I believe in both briefs, seem to have some sort of continuing resonance, though it's not clear whether they're just considered as one more element to be followed in the review or if they're still to be considered separately. For our purposes, they are very similar. So I believe that our addressing of the LaSalle factors does sufficiently also address the Peoria County ordinance. The parcel I want to discuss briefly, and Justice Wright, you might not be as familiar with the three areas, just as Holdridge is, but if I can describe where this is for you. There are two parcels. One is zoned industrial, heavy industrial, I-2. The other is A-2 agricultural. Do you have a gravel pit? What does the zoning have to be? Either A-2 or I-2. This is a special use under the ordinance for both A-2 and I-2 zonings. So the zoning did not require change for this project. It was already I-2, A-2 when we moved in. A special use is required, however, to be obtained. So this is on Old Galena Road, which used to be a pretty main thoroughfare. There's a secondary road now that also goes north-south, sort of along the river. We are just north of the Caterpillar Tractor Company engine plant, and there's a tech center, too. It's a very large campus. It actually looks sort of like a college campus over there that has a lot of tech and also manufacturing components. We're just north of a fuel depot. There's some silos you can see. We're about 2,500 feet from the tech center. The road that we're off of is rated for an 80,000-pound county highway, a main county highway. And just to draw the court's attention briefly to the comprehensive plans, there are two plans that seem to be at issue here. The first is the Peoria County Land Use Plan. It states, and this is at page 48, and it is included in our supplemental appendix as well, areas claimed for industrial, office, and research uses are concentrated in three primary locations where transportation and utilities can be efficiently provided. These include land north of the city of Peoria along Old Galena Road in the vicinity of the Caterpillar Complex. That's exactly where we are. In the mineral resources section of the plan, at page 83, the county states, within the county, the areas with the largest deposits of the best sand and gravel are located east of the bluff in Chillicothe and Medina Townships. The Chillicothe River Small Area Advisory Group should evaluate the possible expansion of sand and gravel extraction operations in this area. And they did so in the Chillicothe River Land Use Plan, which is the other comprehensive plan at issue in this case. In this document at page 21, also in our separate appendix, the Small Area Planning Group states, future industrial development outside the urban core should be concentrated in areas where similar land uses exist and where the efficient transportation and utility services can be provided. Two general locations for future industrial development have been identified within the small area. The first is land near the existing Caterpillar Plant on the west side of Route 29. Again, Your Honor, this is just precisely where we are. This is the land that has been identified by the county as being appropriate for this development, and that is what we are seeking to do in this case. Immediately surrounding our property, the zoning is either A2 or I2, depending on different locations. We did a study of the nearby land uses, and we defined that as within a half mile of the subject property. It's a little bit of an arbitrary pick, but that seemed to be nearby in any reasonable meaning of the term. 35% of those land uses were industrial, 58% agricultural, and only 6% were residential. While the county has some concerns about the way that we calculated these numbers, they have proposed no contradictory numbers, even though, of course, all of our data was based on their GIS website. The design of the facility was prepared by a professional engineer, a civil engineer. It's entirely in compliance with the technical requirements of the ordinance. There's no argument on that. We are more than 1,000 feet set back from both roads along which the facility is located. It's a zero-discharge facility. There's no stormwater discharge under our IEPA permit. At the moment, the property is being farmed. It's heavily irrigated because, I think we mentioned this in the brief, the things that make it a great sand and gravel facility make it a pretty not-so-good farm. It's all sand and gravel underneath the surface, and so, sure enough, it takes a lot of water. That being said, with sufficient irrigation, which my clients have installed, they can farm the property. This is a good thing because the way that this operation is proposed to be operated, they would phase in the mining. Only five acres or so would be actually excavated at a time. Meanwhile, the remaining area would be first farmed, and then later would be a small lake that would grow over time as the operations continued. And a reclamation plan was developed and submitted consistent with the county's ordinance. What was the reclamation plan designed to accomplish? It becomes a green space, effectively. It's going to be a lake. Once the excavations are complete, the groundwater is very close to the surface there, so the water table will fill that in. It will be a lake with potential for recreational uses, possibly future development, be it housing or industrial or commercial uses around it. Arguably, the aquifer would be in better state than it is presently. Definitely, I think that can be. Currently, agricultural uses are not necessarily the most conducive to the safety of the aquifer, if you will. In fact, the operation that we are proposing is a removal operation. For that reason, and now, Justice Wright, if I could address some of the vast evidence that is in support of our position, we do have the expert conclusions of two hydrogeologists that there would be no deleterious impact on the aquifer from this operation. Similarly, we have the expert opinion of a traffic engineer that there would be no substantial traffic impact. We have the county staff's own conclusion that there would be only a 1% increase in traffic on Ogallena Road, which is the most heavily impacted from the site. We have an expert conclusion from a mine developer and from a county concerning the negative impact on surrounding properties and the fact that there would not be one. We have the expert conclusion of a county staffer that, in fact, our agriculturally zoned parcel is not deserving of protection under the county's own scale for what deserves and does not deserve protection. We also have extensive lay witness testimony and lay opinion testimony from our clients. In contrast with this, the county has proposed that we allow the speculative concerns of some of the neighbors, which we believe have been fully addressed in our expert testimony and our lay opinion testimony and so on, to provide a rational basis for this decision. To be frank, Your Honors, there is simply not a basis in this record to uphold the decision against these special use permits other than speculative concerns of the neighbors and, I think, an opinion on the part of one real estate broker that he certainly would prefer not to develop a residential subdivision right next to a gravel pit. Well, there are no plans for development of a residential subdivision next to this site and, in fact, this particular gentleman did testify he had successfully sold many houses adjacent to another gravel pit. Now, is residential in this greater land use plan? There is residential addressed in the comprehensive plan. Comprehensive plan. Yes, Your Honor, and no part of this area is designated for residential development. It's primarily agricultural and industrial and, in fact, the maps that I believe are provided in the record do show in the future that the property will continue in its current use, which is to say agricultural for Part B and industrial for Part A. So, again, Your Honor, what we believe is presented to the court is an opportunity to address So is that relevant as to the residential use at this point? We think not, and we've advanced that argument is that there is really no relevance to the argument that this would deter residential development. There is no plan for residential development. And, in fact, one of the comprehensive plans, I believe it's the small area plan, specifically states in agriculture, in the agriculture section, it's page 28, that one of the goals of the county should be to avoid encroachment by residential subdivisions on one of the historically planned agricultural areas. There's nothing inconsistent with this use with those agricultural and industrial uses. Residential uses, however, as you're pointing out, would be, effectively, very much inconsistent with the existing industrial and agricultural development in the vicinity. I believe I am out of time. I will step away. Thank you. Well, I would like you to address one of the factors that the trial focused on, and that was that there wasn't a need for this. The community really didn't need this. The other factor is that a denial of the permit really didn't operate as a hardship on the property. Isn't the fact that those two findings of the trial court, doesn't that show that you properly applied the LaSalle factors? And I'm just wondering why you want us to overlook or ignore those two factors. Well, turning first to the factor of need, the trial court seemingly did not take into account the fact that we presented four witnesses on need. I think the trial court judge only referenced that the members of Mossville Land Investments stated that they had seen a need for this facility. In fact, we also presented the testimony of two very substantial customers of sanding gravel in the Peoria area who testified that routinely 50% or more of the sanding gravel that comes into Peoria County and into that region, I should say, Peoria County, Tasman, Woodford, kind of grouped together, 50% of that gravel and sand is coming from outside the area. There is a need inside the Peoria area for this facility. We believe, too, that the testimony that was presented by Stan Maxheimer and Jill LaHood, who are the members, was also compelling in that regard. The court seemingly glossed over it, and the county has made the argument that need means you have to prove that but for this facility, these contractors will never be able to get sand and gravel. Okay. To address that point, what about the hardship to the property owners? The hardship to the property owners, I think an issue has been made about this question. Can you rely on the possibility of obtaining a special use permit? And the cases that have been cited in that regard by the county are actually rezoning cases. Well, this is a case where no rezoning was sought. Rezoning does require a legislative decision by the county board. It is discretionary, effectively, by the county board. We simply sought special use permits that were in compliance with the current zoning on this facility. Now, as to the hardship, as I've explained, again, the things that make this a good gravel mine make it bad farmland. Yes, through very substantial financial outlay, they have been able to make this property just break even. That is not what the property is for. It is clearly not the highest and best use for this property, which there is substantial evidence in the record, would be worth much more with the special use granted and put to its best purpose. Is it worth nothing without the special use? It is not worth nothing, no. And we would not take that position. And I don't think that's the standard. The question is, it's one of the factors that needs to be considered alongside the primary factors of consistency with the surrounding land uses. One final question for you. You say that the LaSalle factors dovetail with the county ordinance, even if you satisfied your burden on the county ordinance as to, I want to say there's five factors, I could be wrong. That's right. The county could still deny the special use, correct? The ordinance says you may get a special use, but it's not mandatory. This is an administrative decision, Your Honor. If the county found that we had satisfied all five of those conditions that are set forth in its ordinance and still arbitrarily denied the special use permit, we believe that would be a very, very clear abuse of that discretion. Okay, but we're not reviewing the county's decision. We're reviewing the court's decision. That's correct. Okay. You've answered my questions. Thank you. Thank you. Counsel? May it please the court, my name is Melinda Manline, and I'm the attorney for the Peoria County Court that defended this case. The theme of MLI's reply brief and list litigation in Ms. Meyer's argument, to an extent, was what quantum of evidence should be required of an applicant for a special use permit? Clear and convincing evidence. The case law makes that pretty clear. But basically their argument is they retained some experts, they spent thousands of dollars and years of litigation on this case, so what more could they possibly have done? The answer to that question is simple, too. They could have chosen a different location, one that's actually appropriate for this use. In fact, they could have also asked their retained experts who regularly perform full traffic studies and formal mineral evaluations to actually perform those studies so that their opinions are particular to the site in question instead of just broad generalizations. The problem with their questions and their argument is that it relies on some false assumptions. The first one being that they're entitled to this special use. All they have to do is A, B, and C, and it must be granted. But that's not what the ordinance, the statute, or case law says. As Justice Wright pointed out, the ordinance says that the designation of a use in a zoning district does not constitute an authorization or an assurance that such use will be approved. Case law says that the nature of a special use does not make the issuance of a permit mandatory upon compliance with county standards. In other words, they could spend millions or billions of dollars, but that's not enough if it's not an appropriate site. So I kept asking counsel, your opponent here, whose decision are we reviewing here today? We're reviewing the trial court's decision, Your Honor. Which is the application of the list out act. Yes. What's the standard of review? In our opinion, we provided, in our brief, cited to three Supreme Court cases and four appellate court cases that support the position that when a challenge is made to a trial court's ruling following a bench trial, where a zoning decision was examined legislatively under the list out act, just like it was here, the appellate court reviews the judgment to determine if it's against the manifest weight of evidence. Isn't clearly erroneous normally applied to an administrative decision? Or maybe I'm mistaken. For administrative review, I think it's manifest weight of evidence as well, I believe. Do you think manifest weight of the evidence and clearly erroneous are the same standard of review? I believe that the case that the plaintiffs presented, it said that clearly erroneous was applied to legal findings and that manifest weight of evidence was applied to factual findings of the court, like we have here, where the court listed all nine LaSalle factors and made all the factual findings. Okay, so your position is manifestly erroneous. Yes. And in fact, 1350 Lakeshore Associates, in that case, the evidence considered during the trial was all stipulated to by the parties, which is one of the things that MLI says makes this not subject to any other form of review. Also, in Wellesley versus Winnebago County, they found that the standard of review was applicable to denials of special uses, again, like we have present here. So I do believe that's the appropriate standard in this case. Another one of MLI's false assumptions is that the county has to prove that MLI isn't entitled to this use. Throughout its briefing and argument today, MLI kept repeatedly claiming that the county hasn't presented competent evidence to contradict MLI's evidence. First of all, that's a disingenuous claim. The county, or sorry, MLI admitted at the trial court level that the county's pending and zoning staff were experts and they provided reports and testimony recommending denial of a special use. The county also presented an expert real-term broker with the plain language of the comprehensive plan, but that's all actually veering off track because it's not the county's burden here. The county's denial of a special use is presumptively valid. It's MLI's burden to prove otherwise with clear and convincing evidence. If MLI hasn't met its burden, the county doesn't have anything that it needs to contradict. So the question here is, has MLI presented clear and convincing evidence, or more importantly, does the manifest way of the evidence show that MLI has presented clear and convincing evidence? And the simple answer to that question, in our opinion, is no. With respect to the list staff, I think. Yes. Looking at, briefly, each of MLI's witnesses, they presented Robert Archibald as an expert in mining valuations. His opinion, essentially, is that the fair market value of the land for farming today is less than the cash flow it will produce over 30 years if it's mined. Now, as noted in the trial court's findings, there's one obvious problem with that. He's comparing two completely different things, cash flow versus fair market value. An accurate comparison would be fair market value to fair market value or cash flow to cash flow. We don't have the fair market value of the land as a mine. We did have an appraisal of the land as farm-bound, only for Archibald's opinion, he decided that appraisal was too high, even though he has no experience in valuing farmland. And so he considered the fair market value lower for his purposes. We can estimate the average annual cash flow of the property for farming because MLI's managing partner, Stan Maxheimer, testified that the farm cash flow is $200,000 to $300,000 a year. So over a 30-year period, that would result in a minimum of a $9 million cash flow. How many acres? 222 approximately, Your Honor. And there's no evidence that the farming lifespan would be limited to 30 years as the mining lifespan would be. In contrast, Archibald only estimated that there would be a $2 million cash flow for mining the land. And that wasn't, again, based on a formal evaluation of MLI's property, but it used generalizations and assumptions. Devin Birch, as Ms. Neier mentioned, was presented as an expert civil engineer. They largely relied on the fact that he prepared a spreadsheet of surrounding uses and zoning of nearby property. Didn't the trial court reject that? He definitely rejected the area percentages of that spreadsheet, which I was going to briefly talk about here. First of all, Mr. Birch, he prepared this spreadsheet. This is the first time he'd ever prepared such a spreadsheet, and there are no standards in this field for the preparation of this spreadsheet. So he's not an expert regarding these types of spreadsheets. His initial spreadsheet showed that there were 408 residences and 439 parcels within a one-mile radius of MLI's property. That obviously doesn't help their case, so then he drafted a second spreadsheet. He only looked at a half-mile radius. That showed that there were 167 residences and 124 parcels. Ninety-six of those are of one parcel because it's a mobile home park. That still shows that more than 50% of the parcels in the area contain residences. So then that's when he added the percentages of area that supposedly are used residentially versus industrial or agriculturally. Only to pair that percentage, he assumed for industrial parcels that 100% of those parcels were used industrially. For residential parcels, he assumed the exact opposite. He assumed that 100% of them were not used residentially. If there was a house on a residential parcel, they just carved out approximately a one-acre square around that residential use and considered the rest to be non-residential, even if there was no showing that there was any other active use of that property. That's resulted, for instance, in 40% of the area for rural residential parcels being considered non-residential, even though 18 out of 20 of those parcels contained residences. And even with all this manipulation of the data, the final draft of the spreadsheet shows that most, 35% of the area, is industrial. And it's used for the Buckeye Fuel Depot plant, the Cataflow Tech Center, and three to four-acre parcel recently developed by MLI. The remaining land, at least 65%, is agricultural and residential. It has two cemeteries, one of which is adjacent to the parcel, the mobile home park, other single-family residences, and subdivisions. And while I admit that this data was competently manipulated, it's hardly very convincing evidence. And while I present Lee Cannon, who estimated that the gravel pit would increase total traffic by 3%, but he failed to look at the type of traffic it would be generating, which is semi-trucks. He testified that currently, the traffic range from 8% to 10% of the total traffic was actually semi-trucks now. So to add an additional 3% to the total would actually increase semi-traffic alone by about 30%. By MLI's accounts, the current truck traffic is all to the south, where the current industrial development is. They're proposing to expand the industrial use by 222 acres to the north, which would also expand the truck traffic and increase truck traffic to the north by 100%. Also, since the beginning,  without crossing the middle line of this narrow and two-lane highway. And even though that issue was addressed early on and Cannon's opinion was requested later, he never addressed that at all. Even though school buses regularly drive up and down that road, they stop at each house, there are houses located across from the entrance. So what his testimony shows is that one semi-truck will be driving past a nearby residence or cemetery once every seven minutes, where one didn't travel before and with unknown safety risks. Finally, the last expert MLI presented was Stephen Kroll, whose original opinion said that the operation of the open pit mine at this site will add a potential source of aquifer contamination, an above-ground diesel fuel storage tank, and create an additional pathway for that contamination, the open body of water. He also testified that numerous private wells exist in the area, but they could be protected from potential contamination by installing monitoring wells, which is standard in the industry for this type of mine. But MLI doesn't have plans to install any monitoring wells. They have no plans to install these monitoring wells. When the county raised that issue, MLI asked... Don't they have to in this case? I am not aware if they do, Your Honor. They have said that they do not plan to install any. And in fact, when we raised that argument, they asked Kroll to provide a supplemental opinion. And in his opinion, his new opinion, the installation of the monitoring wells isn't necessary because now there are very few wells in the area, very few private wells that need protection. He also then stated that the above-ground storage tank and open pit mining operation did not increase the risk of aquifer contamination. In other words, he pretty much flipped his opinion from what it originally was. The problem with that is that the underlying data didn't change. The number of private wells in the area didn't change from when he said there were numerous wells that could be protected to saying now there are too few wells. I have a real problem with that, science. You're telling me that we've got sand being used in agriculture with herbicides and pesticides being spread, and we're not worried about that? We aren't worried about an open pit gravel? Well, the open pit actually would provide a body of water that allows direct access to the aquifer, so those pesticides that are already being spread can now have a new source to enter the aquifer, and that's actually more direct than it was before. Where are they being spread? I thought we were using the pond for the gravel. They intend to apparently farm some of it as the mining operation is going. Plus there are agricultural uses on three out of four sides, along with residential. There's agricultural and residential all around, so it certainly provides another avenue for contamination to get into the aquifer. Finally, MLI presented four lay witnesses, Joe LaHood, Stan Maxheimer, Terry Beckman, and Wayne Littweiler, to testify for the need for the gravel pit in the area. Maxheimer, Beckman, and Littweiler claimed that the area could use more one-and-a-half-inch gravel, but Beckman and Littweiler have never been able to complete a job due to the lack of gravel being available. Maxheimer claims that limestone has to be substituted for gravel on a regular basis, but it hasn't been done in the last few years, and he couldn't specify any actual year where it had been required. LaHood testified that the area could use more washed sand and gravel, which doesn't support the need for a gravel pit, it supports the need for a gravel washing facility, as Mr. LaHood admitted that he's actually really particular about how his sand and gravel are washed. Finally, both Maxheimer and LaHood admitted that it would be pure speculation on their part to say whether this particular pit had a lot of sand versus a lot of gravel, or how much gravel or what size of gravel. So in other words, they didn't find a factual basis for the need for one-and-a-half-inch gravel, nor did they indicate that this pit would actually be able to meet that need if it existed. As the trial court found, plaintiff's evidence here is scant, almost non-existent. It's certainly not clear and convincing. Nor does it show a need for this particular pit at this particular location. So in sum, plaintiffs haven't met their burden, and it's because they didn't choose an appropriate site. Now obviously they disagree with us on that, so you could consider that a debatable point. But as the Supreme Court has made it clear in Napleton v. Village of Hinsdale, if the validity of the legislative classification for zoning purposes is fairly debatable, the legislative judgment must be allowed to control. That's the case here with MLI's special use, and it's why we're asking you to affirm the trial court's. But that's for zoning. Is there a difference when it's already there's no dispute about zoning? I mean, it's within the zoning requirements, but they're asking for a special use. Right, and a special use is, pardon me, Your Honor, in our opinion under the statute, it considers zoning amendments to include variances, special uses, and rezoning. So this is a zoning decision. Even though it's not changing the zoning, it still relates to zoning and uses, and in our opinion it's a zoning decision. Now, my last question. The cash flow on this 200-and-some-acre farm? Yes. What was the figure they were getting? They said it was $200,000 to $300,000 a year. A year? What are they growing? I believe soybeans. Beans of some type. In his deposition, I asked what the cash flow was annually, and he said about $200,000 to $300,000. Great farm, man. Thank you. Thank you. To address that last point first, I think he testified actually that the best they'd ever done with the facility was $20,000 in a year. Oh. It's the best that they'd ever realized from operations. So I think maybe, I'm not quite sure what Councilman's referring to. That might be in there somewhere as well. Maybe he misspoke. I think we all know that number is not terribly realistic. If that is what he said, I think it must have been a mistake. One other sort of small point I'd like to address just very, very briefly, because I think it's interesting. I think most of the facts that were, or alleged facts, the subdivisions, the interpretations that were addressed by Council are addressed in a responsive brief, and we've responded to them already. I'm not going to get into the minutia. On this question that Steve Kroll, the expert hydrogeologist, discussed, what the difference is between having that lake, if you will, exposed, versus under the sandy gravel. Well, his opinion that there would be no increased risk was based largely on the fact that because this is sandy gravel, a drop of something on the surface travels downward to the water table so briskly that it makes essentially no difference if it's exposed and that sandy gravel is dug out of it, or if it's covered with the sandy gravel on top of it, and crops on top of that. In fact, he also testified at the hearing that by exposing the actual water table, controlling any sort of spill that could happen would be easier. You'd be able to detect it faster because you'd see the sheen on the water, and you'd be able to put in various baffles and things to contain it, and then install monitoring wells as necessary. That there would be enough lead time because the lateral movement of the water table at that point, and of the aquifer, is sort of slow. The downward is fast, the lateral is slow. And Mr. Polk gets into a lot of detail on that. I am not an expert hydrogeologist. And actually, that is maybe the point I want to make here on rebuttal. The council has nitpicked and looked for issues in these experts' reports, and then that is their job. That's fine. That's what one does when one does not have one's own expert testimony that contradicts. Interestingly, though, the county completely ignores the conclusions that those experts make. We are not experts ourselves in these issues. These are the experts, and they've rendered opinions. And those opinions, I think, need to stand for themselves, and there's nothing really to refute them or to oppose them. Now, in terms of the clear and convincing evidence, what could we have done? We could have built this at a different location. Well, I started out by reading some excerpts from the comprehensive plans. This is the spot that it was designated. If we tried to develop it somewhere else in Peoria County, they would pull out the comprehensive plan and say, you're in the wrong spot. It's the wrong location. Comprehensive plan consistency and consistency with surrounding land uses and zoning are the top criteria under the LaSalle factors, and there are citations in our briefing. Those are, by far, those are the overwhelming factors. There is not an obligation for us to prove that each and every one of the LaSalle factors is met on a clear and convincing basis. For example, one of the questions is whether land is vacant to zone. It's not vacant. We'll stipulate to that. Obviously, we plan to continue to farm as part of the phasing operation. So from that perspective, the question is whether, taken as a whole, the LaSalle factors support the issuance of the special use permit, and clearly they do. This is a question. This is a very fundamental question about what one can do with one's property. This is our real estate. Most of the land investment owns it. They should be able to do with it what the statute, what the ordinances say they can do with it, and anything that derogates from that is a very crucial question for this court, and it's a crucial question for us just more generally. Once we have complied with the code of ordinances, once we've complied with the comprehensive plan, what are these additional criteria being placed upon us? We're not seeking a rezoning. This is a special use permit. There is a difference, and that was decided back in Claren, and it's still good law. Now, it is for this court, I'm sorry to say for the first time, in the reported case law that I can find, to determine what the interplay is between the fact that this is still an administrative decision, but it is being reviewed as a legislative decision. We believe that regardless of how the court comes down on that, we have clearly established our case by clarifying the evidence. That being said, it is a very interesting issue, and we look forward to hearing what the court has to say on that point as well. For all the reasons we've discussed here and in the very extensive briefing by the parties, we respectfully submit that the trial court did err, and that error was clearly Veroni's decision, and that in fact these special use permits should have been granted. Thank you. Thank you. Thank you. We will be taking a short recess for a panel change.  conferring with the court.